# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **NO. CR 04-0519 RB** |
| ) | |
| ) | |
| **SHERIDAN W. WALKER,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** came before the Court on remand from the Tenth Circuit Court of Appeals for "consideration of whether exigent circumstances may have justified a search of Mr. Walker's home as a sweep for potential victims." *United States v. Walker*, 474 F.3d 1249 (10th Cir. 2007).

On April 2, 2007, I held a status conference. The Government filed a memorandum in support of remand status conference maintaining that a supplemental evidentiary hearing was unnecessary. Defense counsel requested time to contact Defendant regarding Defendant's position on a possible request for a supplemental evidentiary hearing.

On June 7, 2007, I held a second status conference. Defense counsel requested additional time to contact his client. On June 13, 2007, defense counsel informed me by letter that Defendant did not want a supplemental evidentiary hearing and requested leave to file proposed findings of facts and conclusions of law by June 27, 2007. The request to file proposed findings of facts and conclusions of law was granted by return letter.

Defendant filed proposed findings and conclusions of law on June 27, 2007. The

Government stands on its memorandum in support of status conference. Having considered the submissions of counsel, the record on appeal, and opinion of the Tenth Circuit, and being otherwise fully advised, I issue these findings of fact and conclusions of law.

**Findings of Fact**

1.      On March 19, 2004, Mr. Walker was indicted on charges of being a felon in possession of firearms and certain types of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 1.) On July 16, 2004, Mr. Walker moved to suppress the evidence found in his home during a sweep by police officers. (Doc. 24.) On August 26, 2004, I held an evidentiary hearing on the suppression motion. (Doc. 32.) On August 31, 2004, I issued a Memorandum Opinion and Order ("MOO") denying the Motion to Suppress. (Doc. 33.)

2.      Mr. Walker entered a conditional guilty plea and appealed the denial of his motion to suppress. (Docs. 35; 40; 41.) On January 31, 2007, the Court of Appeals reversed and remanded for "consideration of whether exigent circumstances may have justified a search of Mr. Walker's home as a sweep for potential victims." *Walker*, 474 F.3d at 1254.[1]

3.      At about 12:33 p.m. on October 26, 2003, Roosevelt County Deputy Sheriff Malin

---

[1] The MOO addressed this issue. On page 2, the MOO reads: "the 911 caller had stated that there were two armed men in the house threatening violence, the officers, for their safety as well as for the safety of the second man, performed a protective sweep of the residence." (Mem. Op. and Order 2.) On pages 3 and 4, the MOO provides:
> The 911 caller reported that there were two crazy men in the house with access to firearms and that the men were going to kill each other. Deputy Parker heard Walker shout that he had a "G– damn gun." The officers faced a situation where there were firearms inside the home, it was unclear how many people were inside the home, and the circumstances gave rise to a reasonable fear that the firearms might be used against the officers or others. The officers had reasonable grounds to believe there was an immediate need to ensure their safety and the safety of others by entering the house.

(Mem. Op. and Order 3-4.) On page 5, the MOO states:
> The officers had restrained and removed Walker and the anonymous caller had indicated that a second armed man was in the house. The officers had no way of knowing whether the second armed man had been shot. Under these circumstances, a reasonable officer had to ascertain whether anyone posing an immediate threat, or a wounded individual, or both, were in the house.

(Mem. Op. and Order 5.)

Parker was dispatched to 1868 Highway 236 in Roosevelt County. (Tr. 5.) The dispatcher informed Deputy Parker that an anonymous woman had called 911 from a pay phone outside an Allsups convenience store to report that two men at 1868 Highway 236 were trying[2] to kill each other and the two men had access to guns. (Tr. 7; 57.) When the dispatcher asked the caller what the two men were doing, the caller replied, "I don't know. I left." (*Id*.)

4.  The dispatcher informed Deputy Parker that 1868 Highway 236 was next door to the Sheriff's home, where Parker had visited many times. (Tr. 9.) Deputy Parker proceeded to the home to the west of the Sheriff's house, where a young woman was outside doing yard work. (*Id.*) The young woman was not panicked and was unaware of anything unusual going on in the neighborhood. (*Id.*)

5.  Deputy Parker informed dispatch that he thought the call was probably a hoax, but he would check it out. (Tr. 10.) Deputy Parker proceeded to the correct house, 1868 Highway 236, which was located on the east of the Sheriff's home. (*Id*.) Once he saw the house at 1868 Highway 236, he recognized it from previous experience as the home of Sheridan Walker. (Tr. 11.)

6.  As he approached the house, Deputy Parker heard over his police radio that Deputy Raul Rosa was meeting with John Walker, the son of Sheridan Walker, at the police station. (Tr. 12.) Deputy Parker radioed Rosa to ask whether John Walker had said anything about someone at the house being armed, but Rosa had no additional information. (Tr. 12-13.) There were no cars or people near the house. (Tr. 16.) Despite the confusion, Deputy Parker arrived at the Walker

---

[2] Wanda Walker, Mr. Walker's mother, testified that she made the anonymous call. Ms. Walker testified that she "thought" she told the dispatcher that two men were "threatening to kill each other," not "trying to kill each other." (Tr. 98.) Ms. Walker also testified that she was very upset when she made the call and she did not recall exactly what she said. (Tr. 98-99.) Although I do not believe that Ms. Walker was dishonest in her testimony, her recollection of the call was clouded by her emotional distress at the time of her call and subsequent regret over precipitating the prosecution of her son. Based on these factors, I find that Ms. Walker told the dispatcher that two men were "trying to kill each other" and not "threatening to kill each other."

residence about nine or ten minutes after the first dispatch. (Tr. 19.)

7. As Deputy Parker walked to the door of the Walker home, two other officers arrived. (Tr. 15-16. ) Deputy Parker knocked several times on the storm door and announced himself each time by saying "Sheriff's office." (Tr. 19-20.) There was no response. (Tr. 20.) Deputy Parker opened the storm door to knock on the inner wooden door, which was about ten inches ajar. (Tr. 21.) As he knocked, he announced "Sheriff's office" in a loud, commanding voice. (Tr. 22.) Deputy Parker's knock caused the door to open further, but he saw no one inside. (*Id*.)

8. Deputy Parker again announced "Sheriff's office," at which point he heard a voice shout from inside the house, "Yeah, and I got a goddamn gun." (Tr. 22.). The voice was loud and threatening. (Tr. 23.)

9. Deputy Parker and the two other officers immediately entered the home and ordered the speaker, who was Mr. Walker, to show his hands and stand up. (Tr. 24; 27.) The officers handcuffed Mr. Walker and took him out on the front porch. (Tr. 30-31.) Even though Mr. Walker was in handcuffs, Deputy Parker testified that Mr. Walker was not under arrest. (Tr. 31.)

10. Deputy Parker "still had a great concern." (Tr. 31.) The caller had stated that two men with access to guns were trying to kill each other in the house. (*Id*.) Deputy Parker did not know if there was an injured person in the house who needed medical attention. (*Id*.) The dispatcher had reported two men with guns in the house, but only one armed man had been accounted for. (*Id*.) Deputy Parker and the officers suspected that an injured person might still be in the house. (*Id*.)

11. Deputy Parker and the other officers conducted a sweep of the bedrooms, bathrooms, and closets, looking where someone could have been hiding. (Tr. 33-35.) Deputy Parker testified that he "wasn't searching. [He] was looking for . . . an injured person." (Tr. 62.) During that sweep

4

they discovered firearms in plain view in two of the bedrooms. (Tr. 36.) A check on the firearms determined that three of the firearms were reported stolen. (Tr. 36.) Mr. Walker was charged with being a felon in possession of the firearms found during the sweep, and for being a felon in possession of ammunition.

## Conclusions of Law

1.　The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. Const., amend. IV.

2.　The Fourth Amendment proscribes unreasonable searches and seizures. *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001). Searches and seizures inside a home without a warrant are presumptively unreasonable. *Kyllo v. United States*, 533 U.S. 27, 31 (2001).

3.　The presumption is not absolute. "When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *McArthur*, 531 U.S. at 330.

4　"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, ____ U.S. ____, 126 S.Ct. 1943, 1947 (2006). The government bears the burden of proving the exigency exception to the warrant requirement applies, and that burden is especially heavy when the exception must justify the warrantless entry of a home. *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006) (citations omitted).

5.　The Court of Appeals remanded for a determination of whether the sweep was proper

under the exigent circumstances doctrine set out in *Najar*, 451 F.3d 710, 717 (10th Cir. 2006). *Walker*, 474 F.3d 1253. Under *Najar*, the test to determine whether the risk of personal danger created exigent circumstances is whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable. *Najar*, 451 F.3d at 718.

6. The question of whether "the officers were confronted with reasonable grounds to believe there was an immediate need is guided by the realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers." *Najar*, 451 F.3d at 719 (internal quotations omitted). The inquiry determining the existence of an exigency is essentially one of reasonable belief. *Id.*

7. Deputy Parker responded to a 911 call that two men with access to guns were in the house trying to kill each other. As the Tenth Circuit recognized in *Najar*, "a 911 call is one of the most common-and universally recognized-means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help." *Najar*, 451 at 719 (quotations omitted).

8. After arriving at the Walker home, Deputy Parker encountered an armed man, who turned out to be Mr. Walker, in the house. The presence of a man with a gun in the house corroborated the 911 call.

9. Upon hearing Deputy Parker announce that he was a law enforcement officer, Mr. Walker stated that he had a "goddamn gun." This response would indicate to a reasonable officer that something might be amiss with the armed man's state of mind. These facts would indicate to a reasonable officer that the second armed man described by the 911 caller might be in the house and that Mr. Walker may have shot the second armed man.

10. Deputy Parker and the other officers reasonably believed there existed an immediate need justifying the sweep of Mr. Walker's home for the purpose of ascertaining whether the second armed man, who was referenced by the 911 caller, required emergency aid. Given the totality of the circumstances, the officers had reasonable grounds to believe someone inside the house may have been in need of emergency aid and immediate action was required.

11. The second *Najar* inquiry is whether the manner and scope of the search is reasonable. *Najar*, 451 F.3d at 720. The officers walked through the house to determine whether the second man referenced by the caller had been shot and required medical assistance. The officers confined the search to only those places inside the home where a victim might likely be found.

12. Deputy Parker and the other law enforcement officers had reasonable grounds to believe there was an immediate need to investigate concerns for the life or safety of another and reasonably effected the search. Exigent circumstances justified a search of Mr. Walker's home as a sweep for potential victims.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**